I would ask you, Madam Clerk, to... Oh, there's an empty chair here, ladies and gentlemen. And just to mention that Justice Sears is unable to be with us today, but rest assured, he has read all the briefs, is familiar with the cases, and will be listening to this world. So make sure you talk... Not to talk directly into him, but make sure we make a really good record so he can read it when he returns. So, thank you very much, and do call the case now. 162732, Hizenga Managers Fund v. A. R. King, Ritchie. Can I just ask, first of all, that the lawyers that represent Hizenga will state their names for the record. Both of you, please. Mr. Colley and Mr. Sexton, thank you. All right, thank you. Will both of you be arguing, or just yourself, sir? All right, fine. Very good. And are you ready to proceed? May it please the Court, I'm Tom Colley on behalf of the accountants, which I will refer to collectively as Ritchie. Your Honor, the plaintiff, Hizenga, is a sophisticated hedge fund, and the trial court described Hizenga as engaging in risk enterprise that gravitates to the risk of the unknown. The trial court described the investment strategy that Ritchie has here, which is the investment fund, as a complex and rapidly evolving investment project. There was an investment strategy that had failed 50 times before, and what it involved was accumulating a pool of life settlements into life insurance contracts, and then against that pool of life insurance contracts or life settlements, selling securities, the investment-grade securities that were going to income stream from the life settlements as people died. Ritchie contracted to buy the life settlements from a company called Coventry, and Ritchie was in the process of getting a rating from Moody's that would be an investment-grade rating to sell securities against a life settlement pool when the Attorney General of New York, Elliot Spitzer, sued Coventry. And as part of his suit, the relief he requested would involve all insurers who had sold life settlements to Coventry could receive their life settlements. So as a result, that basically ended the investment. The investment couldn't proceed because all the insurers were potentially able to extend their investments. And what was the date that Mr. Spitzer came forward with that? I think it was October of 2006. Thank you. And even though Hyzenda agreed in writing that it would only rely upon representations in the private placement memorandum, which is referred to as the PPM, once the investment failed, Hyzenda sued Ritchie for a laundry list of alleged misrepresentations and omissions that were outside of the PPM. Weren't there misstatements or omissions in the PPM? The PPM. Judge Flynn did not find any misrepresentations in the PPM. It's in the briefs. The briefs say that, but the opinion does not say that. What the trial court found was that there were three omissions, and those three omissions occurred not in connection with the first investment, but in connection with the second investment, which is starting on October 1, 2005. The first investment was on August 1, 2005. Clearly, if there had been misrepresentations in the PPM, the judge would have found liability with respect to the first investment. He did not. He only found there were omissions in connection with the second investment, which is in October. Was there some consternation about the sudden infusion of the first investment? Infusion of the first investment? The $4.6 million that went in before the second one? The consternation in what sense, John? Well, I thought there was some discernment that maybe there was some concern over that when I read the briefs, but I don't think there was, and I think that they were not raising money. They raised $4.5 million from Hyzenda. Let me ask you this question along those lines. Relative to the first investment, you're right, the court didn't find there was any material omission, but in the ruling that the court made, I'm looking at page 30 of the court's ruling, the court says something like, The PPM did not disclose, nor did Ritchie otherwise disclose, the existence and terms of the June 2005 Coventry deal, which feature arguably obligated Ritchie to buy whatever policies Coventry wanted to sell. Right. So isn't the court suggesting there was an omission? I don't think so, Your Honor. I mean, I think he's talking about what was in there and what was not in there, and he certainly didn't find that was a misrepresentation. And one of the other things that we, the trial, in connection with the PPM for a hedge fund, they're very general. They don't talk about specific investments. It's not surprising that that was, that the details of a specific contract was not in the PPM. Yeah, relative to materiality. Let me ask you this. The court also says on page 30, The PPM also did not disclose, nor did Ritchie otherwise disclose, the fact, which Mulholland knew by at least July of 2005, that Coventry was using Cesano life expectancies with the ABS retaliation. Right. It seems, I mean, is the court suggesting that that was an omission? No. The court offers only an omission in connection with the second investment. I understand that. Yes. But this is what the court said in its ruling. Right. But the court did not. And if you, if, on pages 20 and 29, the court made very clear that what the court found liability on related to three omissions. There were no misrepresentations. What do we describe those things that are on page 30? Is it court musings, or it looks like? I think he was talking about what the PPM said and what it didn't say. And then he went further and talked about, as time progressed, what the parties knew, and then he got to the second investment and talked about what was discussed on a phone call on September 29th related to the second investment. Okay. Mr. Mulholland? Mulholland? Yes, Mr. Mulholland's phone call on September 29th. September 29th. 2005. Right. That was two days before the second investment. Counsel, is there an issue here on the Fourth Amendment complaint being filed? Yes, there is an issue. Oh, address that, please. Yes, the issue is that none of the omissions that the court found actionable, and they're true omissions, that relates to the disclosure of the contract with Coventry, that relates to the use of the AVS 2 table with the Fasano life expectancies, and the model that Richard used. Those are the three omissions that were referred to. And the court talked about how those were omissions that were made during a conversation or were not discussed during a conversation on September 29th, 2005, which is a conversation two days before the second investment. The Third Amendment complaint did not refer or even mention the September 29th telephone call. Nor did it mention the three omissions. They're not discussed as alleged actionable omissions in the Third Amendment complaint. Okay. So some factual allegations were left out of the Fourth that were in the Third. There's more than just factual allegations. We see all the facts. We have the alleged omissions. So to the extent that the complaint was, the Third Amendment complaint largely focused on the failure to diversify the investment. What were the causes of action split? The cause of action was a fraud under the Delaware statutes, but under the law it's clear that you have to put in your complaint the theories of liability and also the ultimate facts, not the pre-evidence, obviously, but the ultimate facts. The Third Amendment complaint talked about how the fund was not diversified. It was promised to be diversified. The Fourth found that there was no promise of diversification. The Fourth found that Hizinga knew the fund was not diversified. So the Fourth went on to find that there was three omissions on September 29th in connection with the second investment. But that conversation is not mentioned in the Third Amendment complaint. The September 29th phone call is no longer mentioned in the complaint, nor are the three omissions alleged to be actions or omissions anywhere in the Third Amendment complaint. Then when the Fourth found that those were the three omissions, the plaintiff went back and amended his complaint to add those three omissions, and that's not committed under Illinois rules. So you have to give the defendant the opportunity to address the theory of your case by having the plaintiff find him that he can use a trial. We didn't have that. A quick look at the Third Amendment complaint. It's clear that the bottom line of that complaint is diversification. The Court said that's not an issue in this case. There was no promise of diversification. There was no expectation on Hizinga's part of diversification. And the new facts that were fled in the complaint, were they shocking to you? I mean, is this something that was spoken about? Well, it's not shocking at all. When they sought leave to file the Fourth Amendment complaint, obviously everybody on our side knew what the purpose of it was, to have the complaint now look at the Court's opinion. So I wasn't shocked in that regard. I was shocked by the Court's opinion, which was strong liability on things that were never said in the complaint, on a conversation that was never said anywhere in the complaint. I mean, once again, the September 29th conversation is not there. It's not anywhere in the complaint. But after the lengthy trial, the Court found that Hizinga had not engaged in any intentional misconduct. That they had not made any actionable misrepresentations. Talked about things that were in the PPM, but never found that Richard engaged in any actionable misrepresentations. Never found that Richard omitted any information in connection with the first investment. And found that Richard did not breach its fiduciary duty. So those are the findings of the Court. Yes. Can I just move on for a minute here? Basically, a lot of the arguments we've raised here about, what is the $323,000 based on? Or what do we use as a basis for finding if it's based on? The argument can be made if the amount is under $10B5, $4, $410, and we need credit cards. So there are really two statutory provisions that are relevant here. And the numbers have changed. I think those guys are going to use the old numbers just for consistency. Yes. So 7303 is one statutory provision. The other statutory provision is 7323. Okay. Now, Delaware courts have looked at those two together. Those two statutory provisions consistently. So let's talk about this. Is there a Delaware case that requires you to look at 7303 and 7323? Or vice versa? Yes. Right. There are several cases that move the two statutory provisions together. There's the Singer case, the Ordon case, the Cooper case, the Hill case, and the Hubbard case. Okay. So those are based on 7303? Correct. Yes. But what those cases are is a plaintiff has brought a cause of action of 7303. Right. And the court said 7303 is a liability section, 72323 is the remedy section. Okay. But we're not talking about 7232 here. Right. So what case do you have, a Delaware case that specifically addresses that? Well, there are no Delaware cases that address that. And the reason why there are no Delaware cases that address that is because it's a remedy section. It's not a liability section. And every court has been talking about that. No court has said if you sue under 7303, you have to look to 7323 for a remedy. But no court has sued under 7323 in Delaware and then said that's a self-standing cause of action because it's not. It's not. Are there Delaware cases that grant motions to dismiss when people file? No. There are just no cases on it. There are no cases one way or the other. This is the only plaintiff that has brought an action. Well, no plaintiff in Delaware has brought an action. Not as great as we are in Illinois, I guess. Well, yeah. But the theory of the trial court was that you can sue under 7323, and then that gives you a separate cause of action than the plaintiff. And the court agreed that if you sue under 7303, you have to look to 7323 for the remedy. And those two are there together. But the court said, well, that doesn't address the issue. You can sue just directly under 7323. Not only has no court in Delaware said that, but that was obviously section 7303, which is tied to 10b-5. If you can do that, why wouldn't everybody sue under that? I mean, the fact that there are no cases in Delaware where anybody is suing under 7323 suggests that the two statutes have to be read together. If they're read separately, it's much easier to go under 7323 because the argument is that there's a strict liability provision. So the courts in Sonoma, Oregon, Cooper, Hill, and Hopper read those together. And, indeed, your Honor, the statute was amended in 2011. And, obviously, the legislators knew that the two provisions were being interpreted by Delaware courts together. And they didn't say anything about that. And, indeed, they put 7303 under a heading that says fraud. And they put 7323 under the remedies for violations provision. And they said 7303 should be construed similar to 10b-5, which we're saying here. Do we consider that the action they took after what we're looking at here? Well, I think it's expected that a legislature has amended a statute after there's a court out there interpreting it and doesn't change it or change the way it's being applied by the courts. That is indicative of the fact that the legislature views that the courts have applied it appropriately. But that's in the brief, that's in the argument? That is in the brief, yes. And then the other argument, Your Honor, is one of the things that the trial court really relied upon, not Delaware cases. You talked about similar cases in other jurisdictions. Pennsylvania, Rule 405 of the Uniform Scores Act, those are not the same provisions. While it may have been true that the Uniform Scores Act was used from 1956 as the start of the Delaware statutes, the statute has evolved over the years as a statute and not a case. The Kronenberg case from Pennsylvania is a very different statute. It has different rules in it. The rules that the court relied upon in determining that one provision gave a cause of action are not rules that are in the Delaware statute. Moreover, Sections 405 in the Pennsylvania court apply to sellers. They don't apply to purchasers. In this case, those 7303 and 7323 apply to sellers and purchasers. So if I read this correct, in 7323, it was an independent cause of action. That is, no strict liability. But that would mean that the purchaser could sue under strict liability. And no case has ever had that anywhere. The purchaser doesn't have to prove scienter, reliance, or causation to recover. So one thing that clearly differentiates the Delaware statute from any other statute that the court said was an identity statute is the fact that the Delaware statute applies to purchasers. Rule 405 does not. The Pennsylvania statute does not. Most of the statutes we'll talk about, in fact, they list things out for their purchasers because they have to do that to make it consistent with all the other statutes we're talking about here. No court anywhere in the United States has had strict liability for purchaser securities. And it depends on the purchaser themselves. That's what the federal has to decide in order to agree with their interpretation of that statute. Okay, counsel, let me move on here to the omissions that the court found relative to the second. Right. Now, as far as the test for materiality, we probably all agree that it's some kind of substantial likelihood that omissions would have been viewed by a reasonable investor as having significantly altered the total mix of information. That's what the court said. Do you recall that? Okay. I think that the test would be, well, there's really two issues with respect to omissions, Your Honor. The most important point about omissions is that pure omissions are not actionable, even in the plain reading of the statute. Well, where do you get that from? A pure omission is, I just want to tell you something. Okay. As opposed to... As opposed to the word... The word pure? No. I'm sorry.  But there's Section 7223. It reads, quote, There's a remedy for a purchaser who omits to say, quote, But that is a half-truth. So a pure omission is not actionable. You have to have a half-truth. If you tell somebody something and there's something else that should have been stated to make that statement true, that has to be disclosed. That's a half-truth. You can't, under Delaware law, the plain language of 7223, you can't make a misrepresentation, and you can't give a half-truth. But pure omissions are not actionable. And that's what the court basically said here. The court said, in talking about this, that the Delaware statute requires us to disclose, requires Richard to disclose, all important information. It talks about how Richard must have full disclosure, and the seller must disclose what is understood to be significant. And the court said, That's not correct. The Delaware Securities Act says you can rely, a seller or purchaser is liable for a misrepresentation or a half-truth. And this is not a half-truth. What's the definition of half-truth? I've got one here now. The half-truth would be... And that's exactly the wording that's used? Half-truth? No, no, half-truth is my wording that's used. It's got to be a fact. It's necessary to make what was said, put it in context. And the court and the advocates, and I've talked about this, it's an amended fact which conflicts with what a reasonable investor would take from the statement itself. So if you say something to somebody and there's something else that should be added, that is actionable. But a pure omission is not actionable. Things that you should be telling an investor, which is what the court found, are not actionable. You don't have to make full disclosure, and that's what the court found. That's not what the Delaware statute provides for. It provides for omissions, and it provides for liability for not telling facts that are necessary to make something you said not untrue. Isn't the better analysis the fine-scale materiality? And the court makes the determination whether it's a material omission or not. Well, I think materiality is a separate test, Joan. I think the first you say to yourself, when the statement is made, is there something else that should be added to make the statement true? And then if the answer is yes, then I think that you go to materiality. But in the courts, there's no court in Delaware that has ever held that a seller is required to make full disclosure under these statutes, 7303 or 7323. I would be serious about that. That's right. You don't have to make it. It's not a full disclosure statute. It doesn't say you're liable for any misrepresentation or omission. The word omission is not in the statute. And from there, it's a failure to state a fact necessary in order to make a statement made not misleading. So leaving out some detail in something you said, that is what is actually going on in the Delaware court. Then, once you've done that, and if it isn't a material fact necessary to make a statement true, then you go to the materiality test. And in this case, all I'm saying is it couldn't be material. For a couple of reasons. Number one, that we had a non-reliance clause. A sophisticated investor agreed that it would only rely on statements in the PPM. And Delaware courts are very, very strong on upholding non-reliance clauses. In fact, they said that a buyer of a security, a sophisticated buyer of a security, signs an agreement, like the Hydenia Defending Subscription Agreement, that has a non-reliance clause, and then sues for something that was a moral misrepresentation. But they themselves are guilty of fraud in effect. But doesn't Kronenberg say that it prohibits the non-reliance clause from buying claims under Delaware? No, no, what that says is, first of all, they're construing a Pennsylvania statute there, not a Delaware statute. It's a Delaware case. It's a Delaware case. But what the court there in Kronenberg said, and they talked about it, says that non-reliance clauses are not a waiver of a fraud claim, but instead they said that it simply limits the scope of the party's contractual obligations set forth in their written agreement. And the court went on to talk about how that's the law in Delaware. And we submitted to the court in a more recent case, the Perot-Tagel case, which says if a party represents your only reliance on particular information, then the statement establishes a universal information on which the party relies. And I think it was a sophisticated investor. They agreed to only rely on PPM. This is a new investment. This is a unique investment. They agreed only to rely on PPM. And then going back to your honest question on materiality, the other thing is that at trial, the issues that were talked about here, I think they said they had no interest in. I asked them, did you ask to see the contracts with Coventry? No, we didn't really care about that. Did you ask to see the maternity assumptions? No, that's a little bit of detail we don't go into. Did you ask to see the model? Well, we understand that the model may be proprietary, but so really a lot of investment managers don't give us their models, so we're okay with that. So those types were not material to our investment decision. All right, so do we even have to get to the materiality analysis? I don't think so, Ron, because I think it's very clear what the court said here, but the court was basing its decision on a pure omission, and that is not, and I think it would not tell you a pure omission is an action. They didn't argue that in the brief. They argued it was a common statement that the court, that Richie made earlier, but if you look at the September 29th conversation, there is no allegation by the court that a statement was made that in order to put it in proper context, Mr. Mahon should have said no. The court just said Richie has to make full disclosure, and that's inconsistent with the federal statute. Okay, counsel, is this a secondary liability? Sure. Sure, a secondary liability. The court basically, well, first of all, there are, again, no cases in Delaware directly on point on this, which is hard to believe, but we've got both sides of the road. So with the Delaware court's answer that they'll look to federal law when there's no Delaware law, if you look to the Third Circuit, the Third Circuit has talked about culpable participation. There was clearly no culpable participation here because there was no finding that anybody at Richie did engage in any intentional misconduct. All right, well, let's just talk about the statute. Sure. It says every person, and so it doesn't distinguish between corporations, whatever, but it does define the statute in terms of every person. Yes. And it does include corporations. Right. And I don't think you want to rely anymore on the scope of the people that would be included within the statute. We're just talking about it as testifying. Because what the court basically said is, and the one that I want to spend some time on is Petey Richie, who's the CEO of Richie Capital. And basically the court said that, of course the court found that Petey Richie didn't know that the information provided by Izinga in the September 29, 2005 call was inadequate. So he didn't know. And the court also said that he is no more of an expert on this complicated life settlement model than anyone else at Richie. So he didn't know about the model. But the court found he was responsible to find out what Mr. Mulholland said or didn't say to Izinga in that September 29, 2005 conversation. No court has ever put that test on a CEO. He was supposed to find out what somebody didn't say during a conversation with an investor. And, indeed, the third story talks about culpable participation. That means deliberately engaging in the wrongdoing. And Mr. Richie did not do that here. All right. But let's talk about the approach the court used based on the Leon case. Yes. To use reasonable care. Right. Is that how we assess this whole secondary liability thing? Yes. But I don't think it was possible to find out what somebody said as exercising reasonable care. I think that what Mr. Richie did in exercising reasonable care is, number one, hire lawyers to put together a PPM, which I think it represented was the only information they would rely upon. So that was carefully crafted with lawyers. Then Mr. Richie also hired Mr. Mulholland, who is an expert in this area, to put together a life settlement model. Again, Jose talks about the lack of Mulholland's expertise. This is a brand-new investment. This is something that had not been done before. No one had ever securitized before. So he was the expert that Richie hired. Mr. Richie relied upon him. And so Mr. Richie was not involved in the sales process. He never met that, I think, until after this lawsuit arose. But he did act reasonably in the sense that he hired professionals and relied upon them as professionals. Let me ask you this. The court did find that Kathleen Richie's partners were all secondary and liable. So what's the review that we give those findings by the court? Well, I think you review them as issues of law. And we leave them deniable because the standard under Delaware is, if we don't have a law on it, you look to the federal cases. And if you look to the federal cases, the cases in the third circuit are crystal clear that culpable participation is the relevant test. But the underlying findings of the court about reasonableness, that's not the noble review, is it? Well, the court didn't analyze it with respect to the right standard. So what standard should the court review? Culpable participation. Once you get the culpable participation, clearly given the court's finding that Mr. Richie didn't know that any information provided to Heisinger was inadequate, didn't understand the model, and there's no question that there are errors, and there's no question that the court talked about Mr. Mahajan, the quarterback of this. How could it be the best case for the argument of culpable participation in the standard? The third circuit case is two weeks with Delaware, and that is in our, because it's in our group. So it's fine. We're fine. Make sure we get that proposal. Sure. All right. Anything else on secondary liability? No, Your Honor. Do you want to finish up? Sure, Your Honor. I think the key points I would like to leave the court with on this is I do think that pure omissions was the basis. If you look at the court's opinion, the court very strongly said that a seller is required to disclose all material information related to an investment. That is not the standard in Delaware. The standard in Delaware is omission or misrepresentation or leaving out a fact in something you say that renders it untrue, which I refer to as a half-truth. And the courts have interpreted that to mean if you say something during a conversation, such as a September 29th conversation, something that is material to make that statement that would otherwise be misleading, then you have to do that. But there's no overall obligation to disclose material information. It's not in the statute. Secondly, I want to emphasize the fact that Delaware courts are very strong on situations where sophisticated investors like Heisinger, their hedge funds, when they agree in a written document, and Heisinger would agree not only in a subscription agreement, but agree that this would be a complete defense in the case that they bought, that their only reliance is on a PTM. Courts in Delaware consistently enforce that. And if it's not an absolute bar to the claim, it's certainly something that should be considered in determining materiality. And the trial court did not consider that. And it's such a high bar that most courts in Delaware say if a sophisticated investor signs a nonreliance provision, they're bound by that provision. Thank you. Counsel, state your name again for the record, if you would, please. Good morning, Your Honors. Chris Barber on behalf of the Plaintiff Appellee Clause Appellant Heisinger Managers Fund, LLP. Good morning. I'd like to start with something that I think crosses a number of the arguments that my colleague made this morning and some of the questions from the court as well. And it relates really to several areas that I'm going to talk about. We keep on hearing about pure omissions, no misrepresentations. I would point the court to the post-trial brief at the record volumes 12 and 13, C2987 to 3011, and also the closing argument slides, which is volume 10 through 12, C2448 and 2520, and then continuing on the next day at C2824 and 2848. Those, that brief in those slides, outline in detail the nexus or the tie between each misrepresentation and half-proof or omission and the PPM. So a lot of this talk about the nonreliance provision or pure omissions is really a bit of a red herring because this investment was served with, amongst other things, an almost 100-page PPM that talked in detail about material contracts, fees, rep expectancy techniques, models and modeling by Ritchie. Every single litigation, every single issue that the court found either a misrep or an omission is discussed in some way in the PPM. It is also discussed in other ways in other materials. There was a lot of back and forth between the parties over whether you should rely on those materials. It was not that reliance was even an element of the claim under the DSA, which I get to in a bit, but I do want to point out that the court specifically asked for and both sides presented extensive argument on the ties between these misreps and omissions and the almost 100-page PPM. The first thing I'd like to talk about in detail is the defendant's efforts to rewrite Delaware Securities Act 7323. Delaware courts certainly don't have the power to do that. Delaware courts don't have the power to do it either, obviously. 7323, which is based almost verbatim, almost to the word, on 410 of the Uniform Securities Act of 1956. Is it only a remedy provision? No. 7323 provides five specific causes of action. Four in A1, referring to the four expressly enumerated sections of the DSA. One in A2, which is the cause of action for the misconduct alleged here, which is mainly selling security by means of any untrue statement of a material fact or the admission to state a material fact necessary in order to make the statement. In one of the circumstances under which they are made not misleading. It then goes on to provide a defense to that A2 claim. And then finally, the last two lines of A2 provides a remedy for all the causes of action set forth in both A1 and A2. What do you make of counsel's argument that no case is construed as a cause of action provision? Well, that's not true. Early discount, we cited. Hearing versus dare, we cited. Those are Delaware federal courts addressing the Delaware, the DSA. The Hilltop case by Judge Schuyler. And the Kronberg case, by analogy, referring to the analogous Pennsylvania statute, and making note that it's analogous to the Delaware statute, 17.3a. So, the notion that this is some great leap is simply not accurate. In fact, you don't need to take my word for it. You can look at Rooney Rose, his treatise on securities regulation, or the long treatise on securities regulation. This has been long book securities law for 60 some odd years. Basically, the one case that the defendants rely on, Singer v. Magnavox, stands for the unremarkable proposition that in the mid-70s, when faced with a plaintiff alleging a cause of action under 7303, which is the 10b-5 equivalent of the Delaware statute, it's based on Section 101 of the Model Act, there is no express remedy or civil right of action under that provision. It's basically limited under the statute to the law enforcement authorities and the state securities administrator. Those are the two folks who bring an action under 7303. The Magnavox, the Singer court, basically did what federal courts were doing in the mid-70s and for probably 10 years earlier. They basically found an implied civil right of action for a violation of 7303 by looking at the remedy language in 7323a-2. And as the court noted when discussing this issue with my colleague, the Singer court basically says when a plaintiff is bringing an action under 7303, it needs to be read in connection with 7323 because there's no prior right of action under 7303. It's not the other way around. And they're in essence asking this court to effectively strike the first five lines of 7323a-2 and just replace them with 7303. That's not the express language of the statute. It's obviously not the intent of the legislature. In 2013, the legislature confirmed that there's an implied right of action, 7303, by putting in that provision, that reference that counsel cited to, talking about how this is basically just like the implied cause of action under 55. So you're saying that you don't have to read 7303 in connection with 7323. If you're bringing an action under 7303, the only place you can find the remedy is in 7323. I understand. But if you're bringing the action under 7323, do you necessarily have to consider 7303? You don't consider 7303. And is there a case on that specifically? Yes, the case is that I cited. Yes, fine. And basically, that's formal law. It's contrary to what counsel said. It's not a strict liability statute. It's what both lawyers and law refer to as inverse negligence standard of liability, which is you're liable unless you prove you either didn't know or you couldn't have known, et cetera. We cite the language in the brief. So it's a relatively longstanding issue, 60 years, and basically they're asking this court to do what no other court has ever done, which is to rewrite the statute. So that's the 7323. And by the way, someone asked a question or raised the issue of, well, why would anyone ever plead a 7303 claim when you've got 7323? Well, Singer actually gives you the answer to that question. 7323, it basically demands heightened disclosure and attention in connection with, in the Model Act, primary distributions. It has very limited conduct and actors that you can go after. Typically, it's the seller or the purchaser, and it's then their officers and directors or their agents, okay? 7303, 10b-5, scoops up a much broader category of actors, and you see it in Singer where they're trying to go after the Ds and Os, not of the seller or the buyer, but rather the target company. That's a classic example where 7323 would not apply to those people  And in addition, it scoops up other kinds of conduct. The Council doesn't mention it, but 7303 has a section in line with Section 3, just like 10b-5 does. Artificial schemes are a fraud. The third section sort of covers anything that might operate as a fraud. None of that conduct would be covered under 7323. So that's why people plead actions under 7303, when they're going after a broader category of defendants. For instance, in this case, if we wanted to go after Coventry, we couldn't have done it under 7323. You'd have to do it under 7303. The Council said about omissions. Excuse me? It said about omissions, material, otherwise. Materiality, that's basically our appeal. So, materiality... Well, does it apply to the second? What's the money or not? I'm sorry? You're talking about your cross-appeal now? I'm talking about the cross-appeal and their appeal. Okay. So what their appeal is based on is their appeal argues on materiality, that the judge used a subjective standard, namely, what was material to us, Heisinger, when he shouldn't have been using an objective standard. Our cross-appeal, interestingly enough, argues that in connection with the first investment, that Judge Flone used a subjective standard for materiality, namely, what the Ritchie defendants knew or believed at the time of the first investment. So you disagree with that? We do disagree with that. That's the point of the cross-appeal. So with respect to materiality, the judge, if you read the opinion, basically sets out that it's supposed to be an objective standard, and everyone, I think, agrees with that, as far as I can tell from reading the briefs. The correct question to ask is whether there's a substantial likelihood that the misrepresentation or omission would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Judge Flone got off on the right foot by correctly quoting the standard set forth in Basic v. Levinson. He does that at page 31 of his opinion. And he correctly applied the objective reasonable investment standard when he analyzed materiality in connection with Heisenberg's second investment. He talks about how a reasonable investor would not have thought that mix of information trivial when referring to connecting the dots about the life expectancy issues that we refer to as the mismatch and other things. Counsel, as far as the court to determine what a reasonable investor would consider, did we need expert testimony for that? No. In fact, that was an issue that the defendants raised and the court absolutely disagreed with them, said he didn't want to hear from experts on that issue. What you look at and what the court references in its opinion with respect to the second investment is you've got what Heisenberg was saying was material, you have what the defendants were admitting was material, you have the PTM, which, as I noted in the beginning of my arguments, sets out in gory detail information and statements about each and every one of the areas, generally speaking, the topic areas of the misrepresentations and omissions that the court found were applicable here. So the court had plenty of information by which it determined what a reasonable investor would have thought was important based on what the Heisenberg witnesses said, what the defendants' witnesses said, and what was out in the PTM. Where the court got it wrong was with respect to the first investment. For whatever reason, the trial court veered off course when it inexplicably and without citation of any authority changed the focus of the materiality inquiry from the hypothetical objective standard to this actual subjective standard of what the defendant's sellers in the case knew and believed to be true at the time. And in court, on page 32, it says, one must be able to perceive materiality at the time, not just in hindsight. It was unfair for the trial court to gauge materiality of this information with respect to the first investment based on what the defendant's sellers actually knew. And I'm not exactly sure what happened here. In some ways, I think when you read the opinion concerning the second investment, it's almost like he confused materiality with scienter. He made a finding specific, basically, that by late September, they knew there was a significant issue and were actually taking steps to cover it up. That's referring to the fact that they told Coventry to stop sending them the FISAO reports on these policies because they couldn't match them with the valuation that was required under the contract and it was causing a problem with respect to the securitization process. Counsel, let me ask you, your opponent argues that the defendant didn't want to know about certain things or didn't question it or... That's not accurate. I think that the one thing that they're referring to is, and I can't remember the exact quote, my colleague may be able to help me, but I think counsel was asking if they were looking at the underlying mortality tables or something like that, and he said, no, that's not, that's a level of detail we would have looked to. They were listening to them about most conservative life expectancy providers, most conservative assumptions. The model issue that counsel raised, Judge Flynn deals with repeatedly in his opinion, where they were asking for the model in the beginning, they were asking for it in connection with the second investment, they were asking for it in the spring of 2006, they kept on asking for it right up until the end, and even though Mr. Mulholland had promised to give them the model from the get-go, he kept on coming up with excuses as to why he could not. And in fact, the judge found that the reason why he didn't want to give them that model was because he knew if they looked at it, they'd realize that the equity security, which is all the fund basically invested in, was basically projected to lose all of its money from the get-go. And this is where the materiality argument relates to our cost appeal. Every single misrep and omission of the judge focused on, the trial court focused on, those facts existed as of the date of the first investment. The Ritchie folks knew the model projected losses for equity back in June of 2005. The Ritchie folks knew that the puppetry and PPA was a material contract back in June of 2005. Remember, Mr. Ritchie first tried to sell this equity piece. He didn't want to have it in his fund. He was trying to sell it to these third-party private equity investors. The way he did it was the only information they gave them was the term sheet for the MPPA. That term sheet was enough because it sets forth that the seller is valuing the policies and pricing them. It sets forth all the fees that were on disclose. That term sheet was enough so that every one of those third-parties that they wanted to rejected the notion of investing in those equity securities. All right. Counsel, let me ask you, as far as our standard of review here on materiality, does that match up to the evidence? Yes. As far as what the court found factually, factual findings underlying the materiality, is that still, is that abuse of discretion? Well, I think there's abuse of discretion on the factual findings. I think that with respect to the standard on the first investment, you know, I think that's a legal issue. I mean, I think the judge clearly has an objective standard with respect to the second investment and a subjective standard with respect to the first investment. Okay? And so that's really just a question of law. I wanted to talk about the non-reliance issue for a moment because we spent a lot of time on this in the trial court. As I noted earlier, the whole thing is a bit of a red herring given the fact that every one of these misreps and omissions are tied to this 8,500-page PPN in one way or another. Is he talking about the Kronenberg case here, or is this a separate argument from Kronenberg? No, no, actually, it is the Kronenberg. Kronenberg deals with this issue. Basically, Kronenberg goes through with respect to the plaintiff in that case's common law claims that have reasonable reliance as an element and talks about how the Delaware courts, mentions the Delaware courts, have been chipping away at Norton. Remember, the only Delaware Supreme Court ruling on this issue is the Norton case, which actually holds that these things are not enforceable. But then over the past 15 years, some of the chancellery courts have been sort of chipping away at it with respect to common law actions where reasonable reliance is an element, and that's fraud and negligent misrep. What Kronenberg says is that that's all fine and dandy, but in the context of these security claims under that analogous statute, number one, reasonable reliance isn't even an element, so that these things would not be enforceable for that reason. And then secondly, the court says, 7323G, the non-waiver provision of the Pennsylvania statute, actually it was the 7323G, the Pennsylvania statute had a section G that's the same as the Delaware 7323G. He said, look, a provision like that would violate the anti-waiver provisions of both the Pennsylvania statute and the Delaware statute. And that's exactly what we argue here. The other thing that's interesting about this particular issue is that the defendant cited sort of a hodgepodge of cases from the Second Circuit, the First Circuit, the Circuit of the District of Columbia, I can't remember where they were all from, basically holding that these non-reliance provisions don't constitute a waiver because you're not waiving a claim under a particular provision, you're just limiting what you can bring it under with those, you know, you can only reasonably rely on those materials that you contractually agreed to do. So they're saying you're not waiving a claim, you're just, basically your reliance would be unreasonable on something that you agreed you would not rely on. In Delaware, Third Circuit, the standard is different. The AUS case, which is what we cited and what Judge Flynn cited in his opinion, takes a completely different approach. AUS says that, look, we do think it amounts to a waiver. We're not going to enforce these things as a bar to bringing a claim on a particular misreferral mission. We are, however, going to consider it, consider the non-reliance provision when assessing the reasonableness of your reliance, where that is an element of the cause of action. So, and remember, Delaware, of course, looks to the Third Circuit when there's an issue about these things. So basically, what we argue and what Judge Flynn found was that they don't work, number one, because reliance is an issue, an element of the case. They don't work, number two, because of 7323G. And they don't work, number three, because under Third Circuit law, now it's federal law, these things constitute a waiver, effectively. Because, and it's interesting, counsel, I heard him raise this materiality argument. In other words, the non-reliance thing works in the materiality. And they actually filed a supplemental brief on this. I can't remember the name of the Illinois case. It doesn't actually even stand for the proposition they say. They basically say no misreferral mission contained outside of the permissible selling document could be material. That's not what the Illinois court found in the case. I guess maybe four words don't make sense. Right. But we actually addressed this in our response to the supplemental brief. But bottom line is that the non-reliance issue is a complete red herring for all three of those reasons. Let's get to the secondary liability issue. And then anything further you want to mention? Secondary liability, this is another one where, quite frankly, I never really understood why there was so much scrim and drang over this. Because the reality is that, first of all, the secondary liability issue under 7323B, it's the express language of the statute. It says what it says. It's been a form book law for 60 years. Ross covers it. Long covers it. And the defendants basically constantly were saying, no, we need to look at the analogous federal statutes, the control of person provisions of the 33 and 34 Act, and culpable participation. And by the way, culpable participation in the Third Circuit does not require intentional evil misconduct, as I thought I made that misheard during the argument. But the bottom line is that the judge is right to rely on the express language of the Delaware statute. And we cite cases to the court in which he actually refers to that set forth what that statute means and what that secondary liability standard is. But when you actually look at the evidence in the case, the judge found Ritchie Capital Partners liable as a seller because they were the ones that were actually putting out all the sales material. But with respect to Finn Ritchie and the other Ritchie entity, the evidence is really astounding. And quite frankly, it would meet the standard of even the federal courts for culpable participation. Let me just ask before we get into that conflict. As far as culpable participation, the court used more of a regionalist standard. Now, are you saying the court misinterpreted the standard of how to assess secondary liability or not? No, I think the court followed the correct standard. My point is that even if you adopted their standard, the federal standard, the conduct here is really beyond that. We were the first people to admit, and the court noted, the standard of conduct that's required for secondary liability under 7323B is lower than the standard for culpability under the federal statutes. And that's why we spent so much time trying to convince the trial court to adopt the federal standard. My point is that even if you adopted the federal standard, you would be justified in tagging both Mr. Ritchie and the other Ritchie capital entity. So Frank Ritchie, he's the founder. He controls everything. He's the driving force of the investment committee. He's the guy who addressed the primary outstanding issue in the draft PPM of disclosures regarding life settlements. Basically, there was all kinds of testimony that Mr. Ritchie controlled every aspect of this investment. He had veto power over any decision concerning this thing. But it's what he knew that really seals the deal. He was warned by his entire staff, first of all, not to sign this deal because they hadn't done adequate publicity on it, and they didn't really understand either the deal or the business. He was warned by his own staff that if they signed the deal, they were going to face a liquidity crisis in February of 2006, which is exactly what happened. And he said, we're going to do it anyway. He tried to sell the equity directly to third parties and failed, knowing that they were, in essence, running away from the disclosures in the term sheet about the MVP. Was that because of Moody's leaving them? No, Moody's didn't leave them until 2006. That's in connection with the securitization. What we planned and proved was that they knew from day one that the equity investment, not the mezzanine piece that went to the offshore fund, was going to lose money under any reasonable set of circumstances. Their own model showed that before they ever sold the deal to us. That's why Dane Ritchie was trying to offload it to those third-party private equity investors, because he didn't realize it. Every time he showed them the term sheet, they said, we don't want it either. All right, as far as Ritchie Partners and Ritchie Capital, any further statement about their secondary liability? Well, like I said, Ritchie Capital was the seller. Ritchie Partners was basically the GP of the fund and was controlled by Dane Ritchie, and in essence, through Dane Ritchie, in their position as the control person of the fund, was the managing member of the fund, I'm sorry, were allowed under the 7323B statute. All right, follow-up on counsel? I've got one issue that I wanted to address quickly. There was an argument raised in the reply brief on their primary appeal regarding this, what they refer to as the jurisdictional argument, and it's really not a jurisdictional argument. It's really a territorial nexus argument. It's raised in the reply brief? It was raised in the reply brief, so it was waived here, but the point I wanted to make was that it was waived in the trial court. They actually didn't raise this issue in the trial court until after they lost, and in fact, the way they got the Illinois Securities Act claim dismissed was by representing the trial court as the territorial nexus that's required to bring a Delaware case was present. They basically told the trial court, dismiss the Illinois claim, choice of law provision, and the nexus exists, so they admitted it exists and then reversed course after they lost and claimed that it didn't exist and they've been applying the law on the law. But not an issue in this case. It's not a concern they waived it. They definitely waived it. Okay. Summing up, then. So I'll give just a couple minutes of time on the rest of the board and the other questions. Thank you. All right. Ten minutes to wrap, counsel. First, just a factual issue that we're in agreement with Judge Flynn on. The argument was made that the equity would lose money under these models. Judge Flynn, when he addressed the breach of fiduciary duty claim, at the end of his opinion, indicated that there was no indication that the equity would lose money. He talked about the fact, and this is on page 49 or 50 of this complaint, that there was going to be a series of these securitizations, a series of pools. The second one was already being set up when Mr. Spitzer brought his suit against commentary. And even if the first one didn't pay off the equity, Judge Flynn did find that the second one could well have paid off. And again, this was not a failed investment based on anything which he did. Judge Flynn also found that this investment could have succeeded after all. I think he said, we can't prove that it would have succeeded, but what Mr. Spitzer did is he pulled the rug out from under it because all of the life-saving deposits in the pools had a question mark on them as to whether they could be rescinded. So when you talk about how the next step will be what we call a contingent failure, we know that they're in the process of that. They're going to get an upgrade from Moody's. And the very day Mr. Spitzer filed a suit was the very day on which Moody's was grading. So there's no indication there's anything fundamentally wrong with this investment. Going back to your first question to me about culpable participation, we cited that on page 45 of our initial brief where we talk about culpable participation, indicating that there is no Delaware case on this, so you look to the Third Circuit. If they agree, you look to the Third Circuit. And we talk about the Belmont case there and the Trescinda corporation case. But importantly, Your Honor, the Belmont case involved Section 12A2. And 12A2 is what they say is the culpable statutory section. And when the Third Circuit even looks at secondary liability under 12A2, they talk about culpable participation as they say is encouraging or permitting the issuance of statements that may be false. And there's no indication of anything which did that. Then, if we go back to the... There's a reference to the... What was the case we were looking for, by the way? That was the Belmont case. That was the Belmont case. When we settled the case on page 45. Correct. And then, Your Honor, the reference here is that these are all similar statutes that the court looked at. Because, as we talked about, there's no case in Delaware that talks about 7322. They're not similar statutes. One thing I didn't hear the closing counsel talk about is the fact that the Delaware statute talks about purchasers. And it can't be a new strict liability statute for rights to purchases. It's just selling the purchases. It's different. And if you look at the Cronenberg case, the judge in the Cronenberg case looked at the Pennsylvania statute and pulled out two words. There are other words. The statute of provisions says, this is the statute or otherwise. You look at another statute, you compare the two, and it says, or otherwise means that there's some additional cause of action. Those words are not in the Delaware statute. So we were looking at a very different statute. In the Hill case, the court in Hill says that all those sections 7323, the blue sky law, and rule 10b-5 were obviously not co-extensive. The two provisions there are markedly similar. The purpose and substance in the language of 7323 parallels that of rule 10b-5. And again, these courts in Delaware have all looked at these two statutes together. One's a liability statute. One's a liability statute. As it relates to the pure omissions, Your Honor, there's a case that we have that I'd like to direct the court to. This is also a 12-2 case. And this is in the Third Circuit where they refer to this in our report. I believe it's the Adam Galt case, which talks about why it states that to avoid committing misrepresentation to the defendant it is not required to disclose all known information, but only information that is necessary to make other statements not misleading. And that's what I was talking about before. That's the difference between a pure omission that's not actionable, just the terrible pure omissions aspect. He erred as a matter of Delaware law on that. They're not actionable. They said, well, we agree with that. We've tried everything in this statement. Well, there was no statement made by Mr. Mahala during that September 29th telephone call that was half-truth, that he had to say something else to make the statement not misleading. They go back to other things, other times. They say this. For example, they say that not disclosing the contrast related to your diversification issue in the complaint. Just so you know, there was no promise of diversification, so there is no half-truth created by those statements. But if they're asking to materiality, Your Honor, Your Honor asked about what was discussed at trial. I'm going to cite a bit of that brief on page 14. So I went through the list of questions we asked the guy from Hyzinga, Mr. Demerais. Did you look at, were you concerned about the mortality tables? No. That's not the kind of level of detail I'm interested in. Did you ask about the contrast assumption? No. That's not the level of detail I'm interested in. Did you ask about the model? And you didn't get the model. Were you concerned about it? Oftentimes, hedge funds don't give us a model because it's proprietary. And they said, well, they asked and they didn't get it. If it was material, they wouldn't have invested until they got it. And they invested, and they invested, and they invested, and they invested all through 2006. Never got the model because it's proprietary. More hedge funds give their models. More of them. There are more than 50 models. There are models not all the day. There are models for the next seven quarters. There are models for the securitization. The models were updated. What model are we talking about? And then I think also the non-reliance clause. And while the court in Carlenburg did say that looking to the Pennsylvania law, and the Pennsylvanians were the ones that looked to the First Circuit. They said it's not an absolute fact. But it is relevant to materiality. It's not if somebody invests, a sophisticated investor in Memphis will only rely on what's in the private First Circuit memorandum. It's not material to rely on other things outside of it. You promised. And there was no contract that said you wouldn't rely on it. These are sophisticated investors. As I actually indicated, the secondary liability is for Frank Ritchie. Yeah, Mr. Ritchie may have been the CEO. But he wasn't engaged in a couple of participations. And the standard that he should have known Mr. Mulholland didn't say is that there's a standard that no CEO can live up to. CEOs hire people. They hire lawyers. They craft private First Circuit memorandums. They put provisions in there that you only rely on what's in their documents. And that's the good faith or the reason that a CEO does. And one other point we didn't address is the issue of interest, if I may, just briefly. Two minutes, yeah. What Jeff's point held correctly is that the issue of pre-judgment interest is you don't have to award a statutory rate. The Court of Equity can award interest based upon equity. And he also said that 10% is a very high interest rate in this day and time. Federal courts, equity courts have also held that 10% statutory rate is too high. So he agreed with that. We filed our briefs. And the reply brief on the issue of interest, I didn't get a cash map today from the CFO, which said that we're making 10% on the investments we currently have. They didn't argue that that was the rate that should be used. They continued to argue with, quote, a high statutory rate. The court should have probably argued, well, if you're going to use discretion, 10% is the right rate. But we went before Judge Flynn. I argued, well, I'm seeing proof of this 10% rate. Let's get discovery on it. Because they had an expert peer trial that said if they had an alternative investment to this investment, the one that we're talking about here, it would be a 1% return. And Judge Flynn did not argue to look beyond that. So I think he erred by not allowing us to take discovery. He erred by looking at taking that after David. Thank you, Your Honor. Thank you. Five minutes. Hello again. So on the issue of the cross-appeal materiality, I just heard a couple of things from counsel that I want to focus on. One of the classic issues on the materiality issue is the model, the modeling. And the court, in essence, found the modeling was material in connection with the second investment, but not material with respect to the first investment, even though we're talking about the same model that existed at both points. Is there any confusion about what model we're talking about here? No. The defendants, Mr. Lem and Mr. Lem specifically, admitted that the model in June showed equity investors losing all their money if they had a buy-and-hold strategy. In other words, if they could not sell or securitize the investments within a, I think it was a 24-month period, was what the model showed. The issue was not whether they could lose all their money. In fact, none of that was disclosed. The issue that there was a lot of arguing about was not whether the model showed that an unsuccessful securitization resulted in a loss. It did. The issue was what the model showed with respect to the securitization. The model then showed a very, I think initially there was some issue, it showed a 6% rate of return if they successfully securitized the investment, which obviously at the time was almost like a savings account. None of that was ever disclosed. But the issue subsequently was that if they deferred their modeling, that those returns actually turned negative. As their model became consul for these various iterations of the model, we actually had an expert in its exhibit, closed exhibit 1359, looked at one of those later models, and out of 10,000 scenarios, they do this stochastic modeling, out of 10,000 scenarios, there were a total of 199 positive outcomes. 199 out of 10,000. And of those 199 positive outcomes, in other words, the other 99,800 were total losses to equity. How many models, again, we just saw one initial model, but then you say what iterations thereof. Were there different models? There were. The models that showed equity losing money if they didn't securitize was the acquisition model, and that was a model that was in place in June. At the beginning, yes. At the beginning. I think what counsel was referring to, these various iterations, were the securitization models that sort of developed over time. But at the end of the day, there was no doubt that everyone was admitting that equity was going to lose all of their money if they were unsuccessful in securitization. And, in fact, it appears as if the equity was going to lose their money even if they were successful in securitization. So it underscores our point on materiality, which is that they knew from day one that this, and I'll actually make reference to it in the emails, that the equity guys are losing out, that we'll protect it in the subordinated debt, but the equity guys are going to lose. That's why they were trying to sell the equity to those third parties. Last couple of issues. New element on conjecture and interest. And, effectively, we lay out in the brief how Judge Flynn ultimately got it right. Her point is this lack of discovery in this affidavit. It was not attached to a reply brief. That affidavit was filed in one of the initial briefs in May 5th of 2015. It was part of the record, no question. Correct. And for May, June, July, and the first half of August, the defendants never raised a peep about that affidavit. Not once. Didn't ask for discovery, didn't question it, didn't say anything. It was only after they lost the pre-judgment interest issue that they started complaining about the fact that they weren't given discovery on this affidavit. And so we note in our brief that we think that they obviously waived that argument by failing to ask for that discovery when they should have during that four-month period. And, by the way, there was no evidence or even suggestion that that affidavit was an affidavit. It was just showing the fund's rate of return over a period of time. The judge, by the way, didn't adopt that rate of return. The court adopted the statutory rate of return in assessing pre-judgment interest. So with that, I thank you very much for your kind attention. Any other questions you have for me? Thank you very much. Thank you very much for your presentations here today. I think very interesting case and really well done, gentlemen. Thank you very much. We'll take it under advisement and you'll be hearing from us shortly. Thank you.